# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JAYSON and JENNIFER NELSON, a
marital community,

               Respondents,

       v.

BEAR CREEK COUNTRY CLUB
HOMEOWNERS ASSOCIATION, a
Washington nonprofit corporation,

               Respondent,

      and

BEAR CREEK GOLF CLUB LLC, a
Washington limited liability company,

               Appellant.

_____

BEAR CREEK COUNTRY CLUB
HOMEOWNERS ASSOCIATION, a
Washington nonprofit corporation,

               Respondent,

       v.

BEAR CREEK GOLF CLUB LLC, a
Washington limited liability company,

               Appellant.

No. 82416-3-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Jayson and Jennifer Nelson sued the Bear Creek Country Club Homeowners Association (HOA) seeking repair or replacement of the on-site sewage system (OSS) on the Nelsons' property. The HOA in turn sued the Bear Creek Golf Club (Club) claiming a water trespass from surface water leaving the Club's adjacent 5th hole fairway (fairway) was the cause of the Nelsons' OSS failure.

The trial court granted the HOA's motion for summary judgment and entered a permanent injunction against the Club. The Club appeals and argues that the trial court erred by (1) denying the Club's cross motion for summary judgment, (2) granting the HOA's partial motion for summary judgment, (3) denying the Club's request to strike the declaration of HOA expert witness Hans Hadley, and (4) entering a mandatory permanent injunction against the Club.

We affirm the trial court's denial of the motion to strike the Hadley declaration, affirm the trial court's order denying the Club's cross motion for summary judgment, and reverse the trial court's order granting the HOA's motion for summary judgment. We remand for trial and for the trial court to lift the mandatory permanent injunction.

## I. FACTS

The Nelsons are homeowners in the Bear Creek Country Club Subdivision (Subdivision). The Subdivision is governed by the HOA subject to covenants, conditions, and restrictions (CCRs). The Subdivision and golf course were developed in the 1980s by the developer that also formed the HOA. The Nelsons' property is located in a row of lots at the lowest point of a large natural east-west running slope.

The golf course's 5th hole fairway (fairway), is located uphill from the Nelsons' lot, on the large natural slope. There are additional homes in the Subdivision lining the

highest point of the slope on the eastern side of the fairway. Water runoff from these homes is managed by dispersing water downhill onto the fairway, which then travels further downhill across the fairway toward the row of lots that includes the Nelsons' lot.

During the development of the Subdivision, King County Public Health (County) approved construction of an OSS to serve the Nelsons' lot. The OSS, as approved in 1988, includes a catch basin lying in the westerly low point of the fairway—just slightly uphill from the Nelsons' residence. The catch basin collects water from the fairway. The figure below shows the Nelsons' lot (outlined in red), located west of the fairway. The figure also shows the catch basin (small, quadruled square) and two French drains feeding into it (dashed black lines). The catch basin empties westward through an outlet pipe (solid black line) that runs adjacent to the Nelsons' southern boundary into another catch basin east of the Nelsons' property (also illustrated by a quadruled square). The catch basin on the fairway remains in the same location, and with the same capacity, as originally designed.



In July 1989, after the golf course was constructed, the developer sold it to one of the Club's predecessors, FVA Investments. FVA Investments granted a septic easement to the HOA in 1991 because substantial portions of the septic systems serving the Subdivision were located throughout the golf course. The septic easement is made up of "septic drain field systems, including drain fields, reserve areas, pipelines, pump stations and ancillary equipment . . . which are located on" the Club's property and serve the Subdivision. The septic easement's purpose is for the HOA's "operation, maintenance, repair, and replacement of the Septic Systems serving the Lots."

-4-

The HOA also has an easement over the Nelsons' lot to maintain its portion of the OSS. Through the CCRs, the HOA has the responsibility to maintain the OSS.

The Nelsons purchased their home in 2013. In the summer of 2016, the Nelsons noticed water coming out of the ground in the rear of their property near where their OSS drainfield was located. The Nelsons began complaining to the HOA. The Nelsons informed the HOA of what they believed were deficiencies in the OSS. The HOA did not address or fix the claimed deficiencies. The Nelsons later began noticing the erosion of dirt over their drainfield, cracking and sinking of a concrete slab patio adjacent his house, and the formation of high water marks along their foundation.

Between April and July 2019, the Nelsons re-landscaped their backyard to try to address the surface water issues. According to the HOA's septic designer, Craig Whalen,

> The homeowner has re-graded the backyard and appears to have disturbed the cover soil over the drainfield and replaced it with gravel and has modified the contours to add a small wall with a drain below the existing drainfield. Removing the soil and re-grading the drainfield area is one of the factors that could have led to the failure of the system.

The Nelsons performed the landscaping work without the approval from the HOA. When the Nelsons tried to obtain retroactive approval, the HOA conditioned it on the Nelsons indemnifying the HOA for any potential damage to the OSS from the landscaping. The Nelsons refused.

In December 2019, following more complaints by the Nelsons about the OSS, the HOA hired Evergreen Sanitation to investigate the system. Evergreen Sanitation reported "obvious" deficiencies with the OSS unrelated to surface water. That same

month, the Nelsons shared video of the surface water runoff from his property with Club Supervisor Pyatt Potuzak.

On January 3, 2020, the Nelsons sued the HOA for breach of contract, negligence, quiet title, declaratory judgment, damages, and injunctive relief. The Nelsons sought, in part, the repair or replacement of the OSS.

On January 9, 2020, King County Environmental Health was notified that effluent was surfacing from the OSS on the Nelsons' property. After reaching out to the Nelsons and the HOA, on January 23, 2020, the Environmental Health inspected the Nelson property and "noticed evidence of stormwater drainage onto the drainfield, as well as seepage from the ground in the proximity of the south-western part of the drainfield."

A week later, King County Stormwater Services conducted a site investigation of the stormwater drainage onto the Nelsons' property. Stormwater Services reported that a little over "an acre of the fairway is draining to the small yard drain" in the southeastern side of the Nelsons' property. The County notified the Nelsons and the HOA that it recommended the drainage issues be addressed before continuing with repairs to the OSS. On April 16, 2020, the County issued a notice of violation to the Nelsons and the HOA that required the OSS be repaired by May 18, 2020.

Meanwhile, on January 22, 2020, HOA representative Liz Dobyns e-mailed Club general manager David Kass, and assistant general manager Claire Klontz, informing them of the issues the Nelsons were having with runoff from the golf course. In response, Potuzak inspected the interior of the catch basin's outlet pipe with a drain camera, finding that it was in working condition. The Club informed the HOA that it had

made no changes to its property that would alter the water flow and that the drain was functioning properly.

On April 17, 2020, the HOA answered the Nelsons' complaint. The HOA's answer included a third party complaint against the Club for water trespass, contribution, and injunctive relief.

In May 2020, the HOA hired Whalen as its septic designer to assist with a redesign application to the County. Following a site visit, Whalen prepared a report identifying several factors, including the Nelsons' grading and surface water runoff from the fairway as possible causes:

> The septic system is in a state of failure from effluent surfacing in the drainfield area and flowing down towards the house and tanks. The homeowner has re-graded the back yard and appears to have disturbed the cover soil over the drainfield and replaced it with gravel and has modified the contours to add a small wall with a drain below the existing drainfield. Removing the soil and re-grading the drainfield area is one of the factors that could have led to the failure of the system. Other factors include the age of the system (31 years), no timer control unit running the septic, possible leaking tanks, and large amount of runoff water flowing from the Bear Creek golf course. The failure of the system cannot be narrowed down to say which factor caused the system to fail. The water run off as noted in King County's Violation letter could be a strong factor that caused the failure of the system as it is stated that "a little over an acre of fairway is draining to the small yard drain" and that yard drain is not big enough to handle the amount of water that is draining to it. It was observed that the drain is very small for such a large amount of water. There was evidence of sheet flow over the berm of the drainfield down to the home.

The Nelsons also hired their own septic designer, Brad Davis, to propose an alternative design to resolve the OSS issues. The Nelsons requested permission from the HOA to submit Davis's design to the County, which the HOA refused.

-7-

## II. PROCEDURAL HISTORY

The HOA moved for partial summary judgment on its water trespass claim against the Club. The HOA requested a permanent injunction prohibiting the discharge of surface water from the golf course onto the Nelsons' property. The HOA argued that undisputed evidence demonstrated that the Club (1) made alterations to its 5th hole fairway causing the collection and discharge of an excessive and increased amount of surface water towards the Nelsons' property and (2) failed to act with due care in alleviating these drainage issues despite "clear findings by King County inspectors" and "obvious resultant damage to the OSS." The HOA asserted that a permanent injunction was the only adequate remedy for ongoing water trespass. The HOA relied in part on the declaration of Whalen, which included the May 20, 2020, report quoted above.

The Club submitted a consolidated response and cross motion for summary judgment. The Club argued that the septic easement divested it of any duty to address the alleged runoff, and that there was no factual basis for a water trespass claim or exception to the common enemy doctrine. The Club relied in part on the declaration and report of its expert witness, Owen Reese, who opined in part: (1) the direction of the slope of the fairway had not changed with the development of the golf course, (2) that the catch basin appeared to be in the same configuration relative to its installation in 1989, (3) the golf course receives substantial amounts of water from five residences that manage stormwater flow by directing it onto the golf course, (4) the septic drainage managed by the HOA contributes flow either directly or indirectly into the catch basin, (5) the Nelsons' property has historically received runoff from, and is in the natural drainage course of, the golf course, and peak events are significantly comprised of

surface water initiated from the adjoining residential properties, and (6) Club changes on or near the fairway are beneficial or have no impact on surface water flow, and did not alter the natural topography of the golf course drainage basin that has existed for over 30 years.

The Nelsons joined the HOA's motion for summary judgment against the Club.[1] The Nelsons relied in part on the declaration of their expert witness Anthony Dubin. Dubin opined that the golf course's construction and contouring of the 5th fairway caused concentrated stormwater flows onto the Nelsons' property.

The HOA responded to the Club's cross-motion for summary judgment and included the declaration of its expert witness Hadley. Hadley opined that the ponding of stormwater might occur for three likely reasons: clogging of the grate with leaves and debris, the outflow pipe from the catch basin is not large enough, and debris or sediment was clogging the catch basin, outflow pipe, or both. Hadley added that the collection system lacked an overflow feature to accommodate flows that exceeded the capacity of a collection system.

The Club moved to strike Hadley's declaration because the HOA did not identify Hadley until after the Club had filed its cross motion for summary judgment. The trial court denied the motion to strike Hadley's declaration.

On February 2, 2021, following two oral arguments, the trial court entered two orders addressing the cross motions for summary judgment. In the order granting the

---

[1] On October 28, 2020, the trial court granted the Nelsons' motion to amend their complaint adding claims against the Club.

HOA's motion for summary judgment and entering a permanent injunction, the trial court stated, with respect to Reese's testimony that:

> At best (from the perspective of the [Golf Club]) [Reese's] opinions regarding the 1979 topographical survey are inconclusive. At worst (again from the perspective of the [Golf Club]) they are suggestive of lack of credibility—for on the one hand he uses the 1979 topographical survey's limitations to criticize Messrs. Dubin and Hadley's conclusions, while on the other he uses the same survey to bolster his assertions that it "does support that the general flow direction of stormwater drainage in the area (i.e. from east to west) has not changed with development of the golf course." In any event Mr. Reese's declarations and report in no way raises any genuine issue(s) of material fact(s).

The order included seven findings of fact, including "surface water from Bear Creek Golf Club is being collected and discharged upon the Plaintiffs' property in quantities greater than or different from the natural flow." The court entered a permanent injunction against the Club "enjoining the continued trespass of excess surface water onto Plaintiffs' property."

The trial court's order denying the Club's motion for summary judgment stated, "there remains a question of material fact as to whether the evidence of damages sustained by Plaintiffs are due to the water from the [Club] property or because of the actions/inactions of the [HOA]." In sum, the trial court's orders granted summary judgment for the HOA as to liability on the water trespass claim, denied the Golf Club's motion for summary judgment, and permanently enjoined the Golf Club from continued water trespass.

A commissioner of this court granted discretionary review.

III. ANALYSIS

A. Standard of Review

This appeal arises from cross motions for summary judgment. We review summary judgment decisions de novo. Int'l Marine Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 281, 313 P.3d 395 (2013). "Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998); CR 56(c). The moving party carries the burden to demonstrate that there are no issues of material fact and reasonable inferences from the evidence must be resolved against the moving party. Folsom, 135 Wn.2d at 663. "Even where the evidentiary facts are undisputed, if reasonable minds could draw different conclusions from those facts, then summary judgment is not proper." Chelan County Deputy Sheriffs' Ass'n v. Chelan County, 109 Wn.2d 282, 294, 745 P.2d 1 (1987). A trial court's findings of fact are superfluous in summary judgment proceedings and have no weight on appeal. Chelan County, 109 Wn.2d at 294 n.6.

B. The Common Enemy Doctrine

The Nelsons and the HOA sued the Club for water trespass, alleging that the Club artificially collected and discharged surface water into the OSS and the Nelson property in a manner different than the natural flow of such water. Washington recognizes trespass by water. Grundy v. Brack Family Trust, 151 Wn. App. 557, 566, 213 P.3d 619 (2009) (citing Phillips v. King County, 136 Wn.2d 946, 957 n.4, 968 P.2d 871 (1998)). Water trespass may be intentional or negligent. Where, as here, the

allegations are negligence, the plaintiff must prove "duty, breach, causation, and damages." Grundy, 151 Wn. App. at 566.

The claims against the Club involve surface water. Surface waters are "ordinarily those vagrant or diffused waters produced by rain, melting snow, or springs." King County v. Boeing, 62 Wn.2d 545, 550, 384 P.2d 122 (1963). Surface water is distinct from water flowing in a natural watercourse which is defined as a "channel, having a bed, banks or sides, and a current in which waters, with some regularity, run in a certain direction." King County, 62 Wn.2d at 550.

Washington has long followed the "common enemy doctrine" for addressing alterations to the flow of surface water. "In its strictest form, the common enemy doctrine allows landowners to dispose of unwanted surface water in any way they see fit, without liability for resulting damage to one's neighbor." Currens v. Sleek, 138 Wn.2d 858, 861, 983 P.2d 626 (1999). While Washington still follows the common enemy doctrine, because its "strict application of this rule is widely regarded as inequitable," our Supreme Court has recognized three exceptions to its strict application. Currens, 138 Wn.2d at 861-62. Two of the recognized exceptions are relevant here.[2]

Under the "collect and discharge" exception, surface waters may not be artificially collected and discharged on adjoining lands in quantities greater than, or in a manner different from, the natural flow thereof. Currens, 138 Wn.2d at 862. "This rule prohibits a landowner from creating an unnatural conduit, but allows him or her to direct diffuse

---

[2] The third exception is that an individual may not inhibit the flow of a watercourse or natural drainway. Under this exception, a landowner who dams up a stream or natural drainway is not shielded from liability. Currens, 138 Wn.2d at 862. There are no allegations that the golf course dammed up a natural drainway.

-12-

surface waters into pre-existing natural waterways and drainways." Currens, 138 Wn.2d at 862. A landowner may not, however, discharge surface water "through a culvert or drain artificially constructed and located apart from a natural watercourse or natural drainway." Hedlund v. White, 67 Wn. App. 409, 416, 836 P.2d 250 (1992).

> It is not permitted to concentrate and gather [surface] water into artificial drains or channels and throw it on the land of an individual owner in such manner and volume as to cause substantial injury to such land and without making adequate provisions for its proper outflow, unless compensation is made.

Rothweiler v. Clark County, 108 Wn. App. 91, 99, 29 P.3d 758 (2001).

Under under the "due care" exception, a landowner who alters the flow of surface water on their property is required "to exercise their rights with due care by acting in good faith and by avoiding unnecessary damage to the property of others." Rothweiler, 108 Wn. App. at 101 (citing Currens, 138 Wn.2d at 865).

C. Hadley Declaration

Because our review of the evidence is de novo, we first address the Club's argument that the trial court erred in denying its request to strike the Hadley declaration in support of the HOA. We disagree.

We review a trial court's choice of sanctions based on a discovery violation for an abuse of discretion. Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). A trial court abuses its discretion when its decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Assoc. Mortg. Inv'rs v. G.P. Kent Constr. Co., 15 Wn. App. 223, 229, 548 P.2d 558 (1976). To elect for a harsher remedy, a party must have (1) willfully or deliberately disobeyed a

discovery order; (2) prejudiced the opponent's ability to prepare for trial; and (3) lesser

sanctions than exclusion are inadequate.  Burnet, 131 Wn.2d at 494.

The trial court did not abuse its discretion by denying the Club's motion to strike

the Hadley declaration.  In its reasoning, the court stated:

> In its Motion to Strike, the [Club] did not engage in a discussion of the
> requisite Burnet factors.  Instead, it noted that Mr. Hadley's disclosure as a
> witness was not made until November 19, 2020, after the [Club] had filed
> its Cross-Motion.  The decision to retain Mr. Hadley as an expert witness,
> however, resulted from the deposition testimony of Plaintiff Jayson Nelson
> and the [Club's] representative, Pyatt Potuzak, on November 4, 2020.
> These depositions revealed for the first time that Mr. Nelson's prior
> statements about re-grading work (and its impact on the terrain) at the
> [Club's] 5th hole fairway, were likely based on pure speculation, and that
> Mr. Potuzak was aware of artificial French drains installed on/next to the
> 5th hole which were directly connected to the catch basin at issue.
> Moreover, Mr. Potuzak testified that he had observed water flowing from
> the 5th hole in a north-south direction, contrary to the supposed natural
> slope of the terrain.  As soon as the [HOA] retained Mr. Hadley as an
> expert, it notified opposing counsel on November 16, 2020, of its hiring of
> an expert, and requested permission for that expert to make a site visit.
> The day after opposing counsel agreed to the site visit, the [HOA]
> identified Mr. Hadley as its newly retained expert.
>
> Under these circumstances, the Court finds that Mr. Hadley's late
> disclosure was neither willful nor deliberate.  The court also finds that the
> [Club] was not substantially prejudiced by the timing of the disclosure.
> Therefore, the imposition of sanctions is neither warranted nor
> appropriate.

Based on the timing of the Hadley declaration, and the trial court's reasoning in

denying the Club's motion to strike, the trial court did not abuse its discretion.  We

consider the declaration on appeal.

D.  Summary Judgment for the HOA

We next address the Club's argument that the trial court erred in granting

summary judgment for the HOA and Nelsons.  The Club contends the trial court erred in

-14-

concluding that the HOA demonstrated that the collect and discharge exception to the common enemy doctrine was met. We agree.

The trial court found, based on "undisputed facts," that the collect and discharge exception to the common enemy doctrine was met because the Club used artificial French drains to channel surface and sub-surface water from the 5th hole fairway to the catch basin located immediately adjacent to the rear or the Nelsons' property.

It is unclear how the trial court determined that there was no dispute of material fact over what is a highly technical factual question. For example, Hadley opines that:

> Although the French drains are likely located within the contributing drainage area, they do create a more efficient flow path for shallow groundwater to be directed to the catch basin, which reduces the available capacity for accepting surface water runoff. Without the presence of the French drains, this shallow groundwater would not otherwise reach the catch basin.

In direct contrast, however, the Club's expert Reese explained:

> The Nelsons' property has historically received runoff from, and is in the natural drainage course of, what is now the Golf Course property. Therefore, the surface water discharged from the Golf Course toward the catch basin, which, during peak storm events, is significantly comprised of surface water initiated from the residential properties, flows naturally in the downgrade direction across the fairway and toward the Nelson residence.

Reese stated, "[t]he French drains that flow into the catch basin do not affect the size of the drainage basin, as they are wholly contained within the basin boundary."

If the French drains are part of the drainage basin that naturally flows toward the catch basin, Reese's testimony appears to dispute the suggestion that the French drains divert surface water toward that catch basin that wouldn't otherwise flow there. The experts appear to agree that the catch basin is located in the topographic low point of the area and that surface water in the drainage basin ultimately flows toward it. While

-15-

it is possible the French drains may hasten the flow of surface water toward the catch basin, hastening the flow of surface water is not actionable so long as the water is not diverted from its natural flow. Currens, 138 Wn.2d at 862. There remains a dispute of material fact as to whether the Club acted to collect and discharge surface water onto the Nelsons' property in a manner different from the natural flow.[3] The trial court erred in granting summary judgment for the HOA.

### E. Denial of the Club's Cross Motion

The Club argues that the trial court erred in denying its cross motion for summary judgment. The Club argues that the trial court erred in dismissing the contribution claim for three reasons: (1) there is no evidence of a negligent act taken by the Club that resulted in water trespass, (2) the septic easement shifted any duty to address runoff to the HOA, and (3) any over-taxing of the yard drain was not caused by the Club. Disputes of material fact exist such that each of the Club's arguments fail.

### 1. Negligent Act

The Club first contends that there is no evidence that it did anything to change the existing configuration or grade the fairway since the golf course was built and catch basin approved and installed. As a result, the Club contends that it is not liable for water trespass as a matter of law. We disagree.

The Club relies principally on Hughes v. King County, 42 Wn. App. 776, 714 P.2d 316 (1986) to support its argument. In Hughes, King County held an easement through

---

[3] The trial court also expressed concern that Reese did not address contouring or swales on the fairway, which were alleged to have artificially channeled surface water toward the Nelsons' property. But Reese opined that the artificial features he observed were either beneficial or had no impact on the surface water flow. It appears the trial court dismissed Reese's opinions based on a credibility determination which is inappropriate at summary judgment.

the Hughes' property to install a sewer drainage system. Hughes, 42 Wn. App. at 778. After complaints from the Hughes in 1961, the county improved the system to accommodate flows from larger storms. Hughes, 42 Wn. App. at 778. In 1981, a 75-year storm resulted in overtaxing of the system and damage to the Hughes' property. Hughes, 42 Wn. App. at 778. Following a bench trial, the trial court awarded the Hughes damages, concluding that the 1981 flood and any thereafter constituted water trespass by King County. Hughes, 42 Wn. App. at 779-80. This court reversed, concluding that, based on the trial court's findings, there was no evidence that the county contributed in any way to the flooding that damaged the Hughes's property. Hughes, 42 Wn. App. at 780-81. Importantly, the court explained:

> Negligence could have arisen at several stages, including the design, construction, and maintenance of the drainage system. No finding was made that the County's design, construction, or maintenance of the system's pipes upstream and through appellants' property were deficient in any manner. Although the trial court noted that the County had not inspected or maintained the pipe running through appellants' property since 1969, no evidence suggests that failure to inspect this portion of the system in any way caused the flooding.

Hughes, 42 Wn. App. at 780-81.

Hughes is readily distinguishable for at least two reasons. First, the Hughes court had the benefit of the trial court's findings of fact after a trial. The decision was not made on summary judgment. And second, unlike the trial court's findings in Hughes, based on the declarations submitted to the trial court here, there are issues of material fact as to whether there was negligence in the design and the construction of the fairway leading to concentrating flow toward the Nelsons' property, as well as in maintenance of the existing catch basin.

For example, while disputed by the Club's expert Reese, the Nelsons' expert, Dubin, opined that before the construction of the golf course there was a "broad, consistently sloped hillside that drained to the west-northwest." But it appeared that the current grading resulted in concentrated surface flow toward the Nelsons' property. In addition, the HOA's expert, Hadley, opined that there were three likely reasons for ponding stormwater escaping onto the Nelsons' property and drainfield: (1) the grate over the catch basin getting clogged with debris, (2) the drainpipe out of the catch basin being undersized to accommodate larger storms without an appropriate conveyance system, and (3) the catch basin or outflow pipe becoming partially or fully clogged. While the Club offered evidence that it maintained the catch basin, at best the Club creates a question of material fact.

The Club's reliance on Hoover v. Pierce County, 79 Wn. App. 427, 903 P.2d 464 (1995), is also misplaced. There, the court determined that because the flooding caused by Pierce County's construction of a road and culvert were apparent prior to the purchase of the Hoovers' property, the Hoovers could not advance a takings claim against the county. Hoover, 79 Wn. App. at 434. The flooding on the Nelsons' property, however, was not apparent at the time of their purchase. It was not until 2016 that the Nelsons began noticing increased runoff from the Club, runoff which we cannot conclude was caused by actions or inactions of the Club.

Viewed in the light most favorable to the nonmoving party, the evidence does not support the Club's argument that there was no evidence of negligence during the design, construction, or maintenance of the golf course property and drainage system.

2. Septic Easement

The Club next argues that the septic easement shifted any duty to address runoff to the HOA. We disagree.

The easement's language states that it was granted to the HOA "for the operation, maintenance, repair, and replacement of the Septic Systems serving the Lots." "Septic Systems" are defined in as "community septic drain field systems, including drain fields, reserve areas, pipelines, pump stations, and ancillary equipment." While this language does not necessarily indicate that the HOA is responsible for the runoff, it does indicate that the HOA must keep the OSS in working order to address any runoff issues. But again, there are issues of material fact as to whether the runoff damage was caused by the Club's original regrading, adjoining properties, the lack of OSS maintenance, or the Nelsons' alteration of their own property. At this point it cannot be determined if it is the HOA's lack of maintenance that caused the water damage to the Nelsons' property. Nor can it be determined if the original grading changed the natural flow of surface water and whether the HOA can, or has the duty to, regrade the fairway to return natural surface water flow.

3. The Club's Contribution

Finally, the Club argues that there is no evidence that it contributed to the overtaxing of the drainage system. Again, we disagree.

Each party offered differing expert testimony about changes in the golf course topography, the maintenance of the drainage system, the maintenance of the OSS, the effect of the Nelsons' own alterations, changes in natural runoff, and the overall drainage of the Subdivision as it relates to water flow onto the Nelsons' property. The

record is rife with issues of material fact; it cannot be said that the Club did not potentially contribute to the injury of the Nelsons' property.

The trial court did not err in denying the Club's cross motion for summary judgment.

### F. Permanent Injunction

The Club argues that the trial court erred by entering a mandatory permanent injunction. We review a trial court's decision to grant an injunction and its decision regarding the terms of the injunction for abuse of discretion. Washington Fed'n of State Emps. v. State, 99 Wn.2d 878, 887, 665 P.2d 1337 (1983). A trial court necessarily abuses its discretion if the decision is based upon untenable grounds, or the decision is manifestly unreasonable or arbitrary. Washington Fed'n of State Emps., 99 Wn.2d at 887.

Here, the trial court's injunction was based on its findings at summary judgment that the Club was liable for water trespass on the Nelsons' property. As discussed above, the trial court erred in granting summary judgment. Granting a permanent easement on this disputed record was an abuse of discretion.

We affirm the trial court's denial of the motion to strike the Hadley declaration, affirm the trial court's order denying the Club's cross-motion for summary judgment, and reverse the trial court's order granting the HOA's motion for summary judgment. We remand for trial and for the trial court to lift the mandatory permanent injunction.

_____ Mann, J.

WE CONCUR:

_____      _____
Coburn, J.                     Andrus, C.J.